ABSALOM WAGGONER ET AL. V. FIRST NATIONAL BANK OF CREIGHTON ET AL.

FILED DECEMBER 5, 1894.    No. 5549.

1. **Partnership:** EXISTENCE: QUESTION FOR COURT. Where there is no dispute as to the facts, or where all the facts are found or admitted, then the question of copartnership or no copartnership is a question of law for the court.

2. ——: ——: QUESTION FOR JURY. Where there is a dispute as to whether a copartnership exists and a dispute as to the existence of facts which are necessary to constitute a copartnership, the question is for the jury under proper instructions.

3. ——: DEFINITION. Copartnership is a contract of two or more competent persons to place their money, effects, labor, skill, or some or all of them, in lawful commerce or business, and to divide the profit or bear the loss in certain proportions. Following Kent's definition, 3 Com., 34.

4. ——: WHAT CONSTITUTES. Sharing the losses of a venture is not essential to a copartnership. If there is a community of interest in the profits as such of the business, and not by way of compensation for services rendered or capital loaned towards the prosecution of the business, it is sufficient to constitute a partnership.

5. ——: SHARING PROFITS: EVIDENCE OF EXISTENCE. Sharing in the profits of an enterprise is *prima facie* evidence of a copartnership, but the presumption of partnership arises from a sharing in profits is not a conclusive one and may be rebutted by the evidence.

6. ——: ——: ——.  Community of interest in profits, not by way of compensation for services rendered or capital loaned, but profits as such, a community of interest in the property the subject of the venture, and a community of power of management of such property, are correct tests of copartnership.

7. ——: ——: ——.  The receipt by a party of a share of the profits of a venture merely as compensation for services, such party having no interest in the property made the subject of the venture, and no power in the management or control of such property, does not constitute such person a partner.  Third point in syllabus of *Strader v. White*, 2 Neb., 348, overruled. *Gibson v Smith*, 31 Neb., 354, reaffirmed.

8. ——: ——: ——.  A loan or advance of money to be invested in some enterprise, the lender to have a share in the profits as a remuneration for such loan or advancement, he having no interest in the property made the subject-matter of the business, and no power of management or control of such property, does not constitute such lender a partner.

9. Chattel Mortgages: RELEASE: EVIDENCE OF PAYMENT. The execution and filing of a release of a chattel mortgage is not conclusive evidence of the payment of the debt secured by such mortgage, in favor of the mortgagee of the property whose mortgage lien attached prior to the execution and filing of such release.

ERROR from the district court of Knox county.  Tried below before ALLEN, J.

*Gregory, Day & Day, Green & Baxter,* and *H. S. Draper,* for plaintiffs in error, cited: Cobbey, Chattel Mortgages, sec. 434; *Deeter v. Sellers,* 102 Ind., 458; *Nichol v. Stewart,* 36 Ark., 612; *Durkee v. Stringham,* 8 Wis., 1.

*W. L. Henderson, O. W. Rice,* and *Barnes & Tyler, contra,* cited: 1 Lindley, Partnership, sec. 11; *Pleasants v. Fant,* 22 Wall. [U. S.], 116; *Chapman v. Lipscomb,* 18 S. Car., 222; *Dils v. Bridge,* 23 W. Va., 20; *Beckwith v. Talbot,* 2 Col., 639; 17 Am. & Eng. Ency. Law, 852; *Plunkett v. Dillon,* 3 Del. Ch., 498.

RAGAN, C.

On the 7th day of May, 1891, a promissory note, due in five months, for $987.20 was given to the Boyer-Shelly Company. This note was signed "James Carlin, S. F. Backus." On the same day a chattel mortgage was given to the Boyer-Shelly Company to secure the payment of this note on the following property: "Sixty head of steers, two and three years old, and branded with slit in right ear. Said cattle were purchased in Union Stock Yards, South Omaha, Nebraska, and are to be shipped to Creighton, Nebraska, and taken to James Carlin's place, four and one-half miles north, put in pasture and remain until ready for market. The above described cattle are all the cattle of this brand on Mr. Carlin's place. That said stock, cattle, and chattels are now in perfect health and in the undisputed possession of said party of the first part on the premises of said party, on section 33, township 30, range 5, in Knox county, Nebraska." This mortgage began as follows: "Know all men by these presents, that we, S. F. Backus and James Carlin (comprising the firm S. F. Backus & Co.), of the county of Knox and state of Nebraska," etc. The mortgage was signed " James Carlin, S. F. Backus," and a true copy thereof was filed in the office of the county clerk of Knox county, on the 9th day of May, 1891, at 9 o'clock A. M., and indexed "Backus S. F. & Co., mortgagor; Boyer-Shelly Company, mortgagee " On the 18th day of May, 1891, a note for $374.50 was given to the said Boyer-Shelly Company, due October 7, 1891. This note was signed "S. F. Backus & Co., by Jas. Carlin." On said 18th day of May a chattel mortgage was given to the said Boyer-Shelly Company on the following described property, to-wit: " Thirty-five steers, two years old, and branded with slit in right ear. Said cattle were purchased in Union Stock Yards, South Omaha, Nebraska, and are to be shipped to Creighton,

Nebraska, and taken to James Carlin's place four and one-half miles north, put in pasture and remain until ready for market. The above described cattle are all the cattle of this brand and age, except sixty head of cattle mentioned in mortgage dated May 7, 1891, and located on James Carlin's place." This mortgage began as follows: "Know all men by these presents, that we, S. F. Backus and James Carlin (comprising the firm S. F. Backus & Co.), in the county of Knox, state of Nebraska," etc., and the mortgage was signed " S. F. Backus & Co., by Jas. Carlin," and a copy thereof was filed in the office of the county clerk of Knox county on the 26th day of May, 1891, at 9 o'clock A. M., and appears to have been indexed "Backus S. F. & Co., mortgagor; Boyer-Shelly Company, mortgagee." On the 2d of April, 1891, a note for $315, due five months after date, was given by James Carlin to the First National Bank of Creighton, Nebraska, and on the same day, for the purpose of securing the payment of said note, James Carlin gave a chattel mortgage to the said bank on the following described property, to-wit: "Thirty-five head of two and three year old steers, marked with a slit in the right ear, kept on my farm near Bazile Mills, Nebraska." This mortgage, or a copy thereof, was filed in the office of the county clerk of said Knox county on the 6th of July, 1891, at 9 o'clock A. M. On the 24th day of July, 1891, James Carlin gave another note for $309 to said First National Bank, due ninety days after date, and on the same day executed another chattel mortgage covering the identical property described in his first mortgage to said bank, and this mortgage, or a copy thereof, was filed in the office of the county clerk of Knox county on the 25th of July, 1891, at 9 o'clock A. M. On the 8th day of October, 1891, James Carlin gave two notes to the State Bank of Creighton, Nebraska, one for $700 and one for $600, each due ninety days after date; and to secure the payment of the same, on said 8th

of October, he executed to the State Bank of Creighton a chattel mortgage on the following described property, to-wit: "Sixty-four two and three year old steers, all marked with a slit in right ear, and are to be fed at Bazile Mills, Nebraska." This mortgage, or a copy thereof, was filed in the office of the county clerk of Knox county on the 13th of October, 1891, at 9 o'clock A. M.

It appears that about November 1, 1891 Waggoner & Birney, the plaintiffs in error, at the request of James Carlin, paid to the Boyer-Shelly Company the full amount of the principal and interest due them on the notes and chattel mortgages held by them and which had been given them on the 7th and 18th days of May, as already stated; and the Boyer-Shelly Company indorsed and delivered said notes and chattel mortgages securing the same to Waggoner & Birney, and at the same time executed and delivered to Waggoner & Birney releases of said chattel mortgages. The object of this transaction was that Carlin desired Waggoner & Birney to lend him some $300 and take a mortgage on all these cattle to secure the amount due the Boyer-Shelly Company and the amount Waggoner &. Birney was to advance him. For this purpose Waggoner & Birney appear to have taken the note of Carlin for the amount of the Boyer-Shelly Company's notes and interest and the amount which Waggoner .& Birney were to lend or advance Carlin; and at the same time took a chattel mortgage on the ninety-four head of cattle described in the Boyer-Shelly Company's mortgages to secure its payment. About the time Waggoner & Birney had this transaction with Carlin they ascertained that the. mortgages made to the Boyer-Shelly Company purported to be executed in the name of S. F. Backus & Co., and thereupon Waggoner & Birney deposited with their bankers at South Omaha the notes and mortgages they had purchased of the Boyer-Shelly Company, the releases of the same, and the new mortgage executed to them by Carlin, and instructed their bankers to

send the new mortgage made by Carlin to Knox county for record. The bank, however, by mistake and contrary to the orders of Waggoner & Birney, appears to have sent to the county clerk of Knox county the releases of the Boyer-Shelly Company's mortgages and these releases appear to have been entered of record by the county clerk of Knox county. The evidence also tends to show that about May 1, 1891, S. F. Backus and James Carlin both resided in South Omaha. About this time Carlin became the owner of a piece of land near Bazile Mills, in Knox county. That an agreement was entered into about this time between Carlin and Backus that the latter should have the option of becoming a half owner in the land, but this part of the agreement between them was never consummated. By virtue of the agreement between the parties, however, Backus advanced $300 towards paying for the sixty head of cattle which were purchased of the Boyer-Shelly Company on the 7th of May, and he and Carlin executed the note and mortgage of that date to the Boyer-Shelly Company for the remainder of the purchase price of said cattle. These cattle were then shipped to and put upon the Carlin farm in Knox county. About the 18th of May, Backus gave his accommodation note to Carlin for $600. Carlin appears to have about this time borrowed from the State Bank of Creighton, Nebraska, some $600, giving the bank his note for the money and depositing the note of Backus as collateral security. With this money he went to Omaha and purchased the thirty-five head of cattle, for which he executed to the Boyer-Shelly Company the note and mortgage, dated May 18. These cattle were also shipped to the Carlin farm and put on the pasture there with the others.

Backus testified on the trial that he and Carlin, about the first of May, 1891, entered into a copartnership under the firm name of S. F. Backus & Co., that they had drawn and signed articles of copartnership; that these articles of copartnership were never filed in Knox county;

that all the cattle belonged to the copartnership of S. F. Backus & Co.; that he, Backus, did not know until about Thanksgiving day, 1891, that Carlin had attempted to mortgage the property to the banks, or to any one else; that the agreement between himself and Carlin was, when the cattle were sold or disposed of, that he, Backus, should first have back the amount of money he had advanced to the copartnership and should also have one-half of the profits made on the cattle; that he mortgaged his house and lot in South Omaha to raise the money to pay the freight on the cattle shipped to the Carlin firm in Knox county; that this copartnership was not to run any specified length of time. Several witnesses also testified on the trial that Backus had told them that he had no partner; that Carlin was not his partner, and that the only interest he had in the cattle was $300 he had loaned Carlin, or advanced to Carlin, towards their purchase. Carlin did not testify in the case, but Birney testified that Carlin had told him about November 1, 1891, that Backus "had nothing to do with the cattle;" that he, Carlin, owed Backus $300, which the latter had loaned him, Carlin. The articles of copartnership testified to by Backus were not introduced in evidence.

From the time the cattle reached the Carlin farm until the day before Thanksgiving day, in 1891, these cattle were herded and pastured on the Carlin farm and were all the time in the possession there of Carlin or Backus or S. F. Backus & Co., or the servants and agents of one of them, and were in the possession of Backus on the day before Thanksgiving day, 1891, when they were seized by the First National Bank and the State Bank of Creighton on the mortgages given by Carlin on the 2d and 24th days of July and 8th day of October, 1891, respectively. On the 4th day of December, 1891, S. F. Backus and James Carlin executed to Waggoner & Birney a bill of sale of the ninety-four head of steers, and on the same date S. F.

Backus and James Carlin executed and acknowledged a writing setting forth that they, S. F. Backus and James Carlin, were a copartnership doing business under the name of S. F. Backus & Co.; the execution on behalf of said firm on the 7th day of May, 1891, of the note and mortgage to the Boyer-Shelly Company; the execution and delivery on behalf of said firm to the Boyer-Shelly Company of the note and mortgage of May 18, 1891; that neither of said notes, nor any part thereof, had ever been paid; that said notes and the mortgages securing the same were, on the date of the execution of said instrument, December 4, 1891, owned by Waggoner & Birney; and that said mortgages had on the 10th day of November, 1891, been entered satisfied in the office of the county clerk of Knox county through mistake and misapprehension and in fraud of the rights of Waggoner & Birney, and on the same day Waggoner & Birney brought this suit in replevin to the district court of Knox county against the State Bank and the First National Bank of Creighton, claiming to be the owners, and entitled to the immediate possession of the ninety-four head of steers mentioned and described in the five mortgages above set forth.

At the close of the evidence counsel for the banks moved the court to instruct the jury to return a verdict in their favor, because: "First, that the testimony as introduced is not sufficient to authorize a recovery on the part of the plaintiffs; second, plaintiffs have failed to show there was any partnership existing between James Carlin and S. F. Backus, but, on the contrary, the evidence discloses that it amounted to no more than a loan of $300 on the part of Backus to James Carlin, to be returned in any event, but if any money was made on the cattle deal, he was to receive a portion of the profits; third, because the plaintiffs in this case have shown no right to recover on the instruments introduced, as the same are shown in law to have been canceled and discharged of record; fourth, because

the testimony shows that after the cancellation and discharge of the instruments upon which plaintiffs seek to recover, the defendants, in good faith, took possession of the property under the mortgages they had thereon with the view of securing their payment by foreclosure of the same, and under the evidence and law as it stands here at this time are entitled to a verdict for the return of the property." This motion the court sustained, and the jury, in obedience to its instruction, returned a verdict in favor of the banks; and to reverse the judgment pronounced by the court on such verdict Waggoner & Birney prosecute proceedings in error to this court.

1. Counsel for the banks say in their briefs that the district court held the four points made in their motion to be well taken as his reason for sustaining such motion. Assuming this to be correct, we think the learned judge was wrong. The question as to whether or not a copartnership existed between S. F. Backus and James Carlin was in this case one of fact for the determination of the jury. The rule is that where there is no dispute as to the facts, or where all the facts are found or admitted, then the question of copartnership or no copartnership is a question of law for the court. (*Everitt v. Chapman*, 6 Conn., 347; *Farmers Ins. Co. v. Ross*, 29 O. St., 429; *Kingsbury v. Tharp*, 61 Mich., 216.) Where there is a dispute as to whether a copartnership exists and a dispute as to the existence of facts which are necessary to constitute a copartnership, the question is for the jury. (*Seabury v. Bolles*, 51 N. J. Law, 103; *Meriden Nat. Bank v. Gallaudet*, 120 N. Y., 298; *McMullan v. Mackenzie*, 2 Greene [Ia.], 368; *Butler v. Finck*, 21 Hun [N. Y.], 210; *McDonald v. Matney*, 82 Mo., 358; *Partridge v. Ryan*, 14 Ill. App. Ct., 598; *Chamberlain v. Jackson*, 44 Mich., 320; *Densmore v. Mathews*, 58 Mich., 616.) In the case at bar evidence had been introduced of statements made by Carlin to the effect that he and Backus were not copartners, and that the money

which Backus had advanced towards paying for the cattle
was a loan to him, Carlin; and evidence had also been in-
troduced of statements made by Backus to the effect that
he had no partner, that Carlin was not his partner.    Now
if these statements of Carlin and Backus were competent
at all, they afforded some evidence which tended to show
that no partnership in fact existed between Carlin and
Backus.    On the other hand, Backus testified positively
that he and Carlin were copartners; that they had reduced
their agreement of copartnership to writing; that he,
Backus, when the partnership property should be disposed
of, was to have back the money he had advanced towards
purchasing the cattle and one-half the profits of the ven-
ture.    The mortgages made by Carlin and Backus to the
Boyer-Shelly Company were also in evidence and they re-
cited that Carlin and Backus were copartners doing busi-
ness under the firm name of S. F. Backus & Co.    This evi-
dence tended to show the existence of a copartnership, and
the learned district court, by deciding this question of fact,
usurped the functions of the jury.    The serious doubt that
arises from a consideration of the evidence in this record is
whether, had the court submitted the question of copartner-
ship to the jury and it had found that no copartnership ex-
isted, such finding could have been sustained.    However, we
have no authority to determine this question of fact, and
do not mean to do so.    Whether a copartnership existed
between Backus and Carlin there was at least some doubt,
and it was for the jury to say.    We might stop here, but
counsel for the banks have made a somewhat extended
argument designed to show that as a matter of law it cannot
be said that a partnership existed between Backus and Car-
lin from any or all the evidence in this record.    We repeat
that as the facts exist in this case we have no authority to
decide the question as to whether or not a partnership ex-
ists between Backus and Carlin, nor do we so decide.    A
partership exists when two or more persons contribute

their property or services to be employed jointly in some enterprise or business the profit or loss of which is to be shared among them in some fixed proportion. (Walker, American Law, 227.) Partnership is a contract of two or more competent persons to place their money, effects, labor, skill, or some or all of them, in lawful commerce or business, and to divide the profit or bear the loss in certain proportions. (3 Kent, Com., 34.) Sharing the losses of a venture is not essential to a copartnership. If there is a community of interest in the profits of the business as such and not by way of compensation for services rendered or capital loaned towards the prosecution of the business it is sufficient to constitute a partnership. (*Cothran v. Marmaduke*, 60 Tex., 370; *Stevens v. Gainesville Nat. Bank* 62 Tex., 499; *Richards v. Grinnell*, 63 Ia., 44; *Munro v. Whitman*, 8 Hun [N. Y.], 553.) Sharing in the profits of an enterprise is *prima facie* evidence of a copartnership; but the presumption of partnership arising from a sharing in profits is not a conclusive one and may be rebutted by evidence. (*Fourth Nat. Bank of St. Louis v. Altheimer*, 91 Mo., 190; *Lockwood v. Doane*, 107 Ill., 235; *Oppenheimer v. Clemmons*, 18 Fed. Rep., 886; *Meehan v. Valentine*, 29 Fed. Rep., 276; *Parker v. Canfield*, 37 Conn., 250.) Community of interests in profits, not by way of compensation for services rendered or capital loaned, but profits as such, and community of interests in the property the subject of the venture, and community of power of management of such property are correct tests of copartnership. (*Lengle v. Smith*, 48 Mo., 276; *Beckwith v. Talbot*, 2 Col., 639; *Beecher v. Bush*, 45 Mich., 188; *Wilcox v. Dodge*, 12 Ill. App. Ct., 517; *Nebraska R. Co. v. Lett*, 8 Neb., 251; *Gibson v. Smith*, 31 Neb., 354.) In *Strader v. White*, 2 Neb., 348, in the third point of the syllabus, it is said: "If a person contract with a partnership to contribute his services to the enterprise, for which he is to be compensated by a proportion of the

profits, he becomes a member of the firm, and liable for its debts, although he do not stipulate to bear any part of the losses." The rule as here stated is not sustained by the weight of authority and can no longer be regarded as law. The liability of White in that case was not placed on the ground that White became a member of the copartnership because he was to receive a proportion of its profits for services rendered by him, but his liability was placed on a finding made by the jury that White was in fact one of the members of the copartnership, though a secret member; and in view of that finding of the jury the case was correctly decided, but the rule as stated in the syllabus is too broad. This syllabus was practically, though not expressly, overruled in *Gibson v. Smith, supra.* The receipt by a party of a share of the profits of a venture merely as compensation for services, such party having no interest in the property made the subject of such venture, and no power in the management or control of such property, does not constitute such person a partner. (See the cases collected and authorities cited, 17 Am. & Eng. Ency. of Law, p. 846.) And a loan or advance of money to be invested in some enterprise, the lender to have a share of the profits as a remuneration for such loan or advancement, he having no interest in the property made the subject-matter of the business and no power of management or control of such property, does not constitute such lender a partner. (See the cases collected and the authorities cited, 17 Am. & Eng. Ency. of Law, p. 850.) A material inquiry in this case was whether the money advanced by Backus was intended by him and by Carlin to be a mere loan to the latter, and another material inquiry was whether Backus, by signing a note with Carlin to the Boyer-Shelly Company for these cattle, intended thereby merely to lend his credit to Carlin; and these questions should have been submitted to the jury.

2. Counsel for the banks say that when Carlin executed the mortgages in question to his clients, he was openly and

notoriously in possession of these cattle, and that his clients received these mortgages without notice of any claim of any one else on the cattle, and that the district court so held. Whether Carlin at the time he made the mortgages to the banks was in the open and notorious possession of the cattle, and whether the banks received their mortgages without notice of the mortgages of Waggoner & Birney, if material in this case, were questions of fact for the jury, and the jury alone had the authority to determine such questions of fact.

3. Counsel for the banks also say that the court held that the releases executed by the Boyer-Shelly Company of the mortgages made to them amounted to a payment and complete satisfaction of the mortgages so far as the rights of the banks were concerned. The banks were not prejudiced by the releases made of these mortgages by the Boyer-Shelly Company, nor by the filing of such releases with the county clerk of Knox county. The lien of the banks on this property attached, if at all, long before these releases were executed, and at a time when the mortgages now held by Waggoner & Birney were in full force and of record in Knox county. The right of the banks to this property is not to be determined by the condition of the mortgage record of Knox county at the time they took possession of the property. Whether Waggoner & Birney, by having the Boyer-Shelly Company execute releases of these mortgages, and by filing the releases in the office of the county clerk of Knox county, and by paying the amount of the notes secured by said mortgages, intended thereby to absolutely pay off and discharge the notes secured by said mortgages, was also a question of fact for the jury, to be determined from all the evidence in the case. If the intention of Waggoner & Birney was that the mortgage releases should only be filed after it was ascertained that Carlin had a clear title to the property, and the mortgage, made by him to them about the 1st of November,

for the amount of the mortgages of the Boyer-Shelly Company, and the amount of the loan Waggoner & Birney was to make to Carlin, should be a first lien upon the cattle, and if the releases were placed by Waggoner & Birney with their bankers, not for the purpose of being filed, but to be held by them until the title of Carlin to the property should be determined, and the bank, through neglect or mistake, contrary to the intention of Waggoner & Birney, and contrary to their instructions, sent the releases to the clerk of Knox county, where they were recorded, then such facts did not operate as a payment and discharge of the notes and mortgages held by Waggoner & Birney. The judgment of the district court is reversed and the cause remanded.

REVERSED AND REMANDED.